# **<u>EXHIBIT A</u>**

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF PLYMOUTH
THE SUPERIOR COURT

Docket No.

ROYAL ADMINISTRATION SERVICES, INC.
a Florida corporation,

Plaintiff,

vs.

PRIVATE RESERVE GROUP INC., d/b/a
AUTO PROTECTION SERVICES, d/b/a AUTO
POLICY CENTER, a California corporation;
and PEJMAN GHANEIAN

Defendants.

## COMPLAINT

NOW COMES Plaintiff, ROYAL ADMINISTRATION SERVICES, INC., ("Royal") by

its attorney, Meaghan Pomeroy, Esq., and complains of Defendants, PRIVATE RESERVE

GROUP INC., d/b/a AUTO PROTECTION SERVICES, d/b/a AUTO POLICY CENTER

("PRG"), and PEJMAN GHANEIAN ("Ghaneian," collectively, the "Defendants") and states as

follows:

### INTRODUCTION

1.     Royal[1] is a nationwide provider of vehicle service administration services. Royal

does not solicit potential customers directly, but engages—via a form Vendor Agreement—

independent contractors, including PRG, to market and sell its vehicle service contracts ("VSC").

The form Vendor Agreement expressly excludes sales and marketing methodologies that violate

applicable state or Federal law, including *e.g.*, robo-calling and contacting consumers on the Do-

---

[1] Capitalized terms used as defined herein.

Not-Call List. In addition, by executing the Vendor Agreement,

2.      PRG represented and warranted it would comply with all laws and administrative regulations that govern or restrict the use of telephone equipment and consumer solicitation. Despite these contractual safeguards, on or around April 4, 2017, Royal was sued in the Northern District of Illinois; the complaint alleges that methodologies employed by Royal's vendor violated Federal law.

3.      Royal investigated to determine which vendor placed the alleged Call. In response to Royal's inquiry, on May 9, 2017, Ghaneian signed and remitted to Royal an affidavit swearing his company (PRG) has no record of making the Call. After incurring unnecessary cost and disruption investigating the origin of the Call, Royal identified PRG.

4.      Royal confronted PRG's owner and CEO, Ghaneian, and was deceived yet again. Ghaneian falsely represented the alleged Call was exempt because PRG had opt-in information or other proof of consent. Within a week, Ghaneian changed his story; Ghaneian represented in multiple emails that the alleged Call was not subject to an opt-in but when PRG scrubbed the consumer information against the Do-Not-Call List it confirmed that the consumer was not on the Do-Not-Call List at the time of the alleged Call.

5.      Ghaneian assured the General Counsel of Royal that he scrubbed the data himself. At the time Ghaneian made these statements they were false and he knew them to be false, Royal relied on these representations in preparing its defense to the Litigation and sustained damages.

6.      Adding insult to injury, the Vendor Agreement requires PRG to indemnify and defend Royal against any cause of action resulting from a breach of PRG's duties, wrongful or negligent acts, and willful misconduct. Royal demanded PRG honor its obligation to defend and indemnify Royal in the Litigation—PRG refused.

7.     Royal is left with no other option than to initiate this action to enforce the Vendor Agreement.[2]

## PARTIES

8.     Plaintiff Royal is a Florida corporation with its principal place of business located in Hanover, Massachusetts.

9.     Defendant PRG is a California corporation with its principal place of business located in Santa Ana, California. PRG is in the business of marketing and selling vehicle service contracts.

10.    Defendant Ghaneian is an individual residing in Santa Ana, California. Ghaneian is the CEO, owner, and registered agent of PRG.

## JURISDICTION AND VENUE

11.    This Court has original subject matter jurisdiction over this matter pursuant to M.G.L. ch 212, § 4.

12.    The amount in controversy exceeds the jurisdictional minimum of this Court.

13.    This Court has personal jurisdiction over the Defendants pursuant to a vendor agreement executed on or around February 23, 2015 ("Vendor Agreement"). A complete and correct copy of the Vendor Agreement is attached hereto as **Exhibit A**.

14.    Ghaneian signed the Vendor Agreement on behalf of PRG as its CEO.

15.    Venue is proper in this county pursuant to the Vendor Agreement which mandates that any dispute between the parties "arising out of, concerning, or in any way relating to this [Vendor] Agreement shall be submitted to a court of competent jurisdiction in Plymouth or Suffolk County, Massachusetts." *Id.* ¶13.

---

[2] Paragraph 6.5 of the Vendor Agreement requires PRG to pay Royal all costs, expenses, and expenditures, including attorney's fees, incurred in enforcing the Vendor Agreement as a result of PRG's breach.

{00273625.DOCX /}3

16.     The "parties expressly agree[d] that they are subject to personal jurisdiction of the courts of the Commonwealth of Massachusetts and will not contest same." *Id.*

17.     Ghaneian regularly does or solicits business in the Commonwealth of Massachusetts and caused tortious injury to Royal in the Commonwealth by an act or omission outside the Commonwealth. M.G.L. ch. 223A §3(d).

18.     In addition, as set forth in more detail below, Ghaneian is an alter-ego of PRG such that personal jurisdiction over PRG is sufficient to establish personal jurisdiction over Ghaneian as well.

## COMMON ALLEGATIONS OF FACT

19.     Royal is one of many administrators of vehicle service contracts ("VSC").

20.     Royal contracts with third-party direct marketing companies across the country to solicit the sale of VSCs administered by Royal.

21.     Royal does not offer VSCs directly to consumers.

22.     Third-party direct marketing companies soliciting the sale of VSCs can choose which administrators' products they wish to sell and often market the sale of more than one administrator's products at the same time.

23.     On or about February 23, 2015, Royal and PRG entered the Vendor Agreement wherein, Royal, on a non-exclusive basis, granted PRG the right to market and solicit certain VSCs administered by Royal. *Id.*

24.     Pursuant to the Terms of the Vendor Agreement, PRG acknowledged and agreed that it would not utilize or employ sales and marketing methodologies that violate applicable state or Federal law, including but not limited to "robo-calling", or "contacting any consumer who has expressly affirmed his or her desire not to be contacted or called." *Id.* ¶2.

{00273625.DOCX /}4

25.     Royal provided PRG with its "Direct Marketer Standards and Guidelines" and the Vehicle Protection Association's "Standards of Conduct" to ensure PRG's marketing, solicitation and sale of Royal's VSCs comply with applicable state and Federal law. Copies of the Direct Marketer Standards and Guidelines and Standards of Conduct are attached hereto as **Exhibits B and C**.

26.     Royal provided a third-party fulfillment center access to VSCs forms, data and information, and that third-party fulfillment center then granted access to PRG through their platform to Royal's and other administrator's forms, data and information, in order to facilitate the sale VSCs.

27.     The Vendor Agreement imposed certain duties upon PRG, including the following:

    a.    To make no statements or representations concerning any VSCs which are misleading, inaccurate or inconsistent with the terms of this Vendor Agreement or any VSC, Ex. A, ¶3.7.;

    b.    To issue VSCs in accordance with the guidelines set out by Royal, *Id.* ¶3.8.; and

    c.    To store, retain, and make available to Royal, in an electronic format acceptable to Royal, records of all transactions between PRG and any consumer who purchases a VSC. *Id.* ¶3.11.

28.     Paragraph 2 of the Vendor Agreement expressly excludes sales and marketing methodologies that violate applicable state or Federal law, including *e.g.*, robo-calling and contacting consumers on the Do-Not-Call List. *Id.* ¶2.

29.     By executing the Vendor Agreement, PRG also represented and warranted that it would:

    a.    Comply with all laws and administrative regulations that may govern the conduct of PRG, including but not limited to requirements concerning licensure, those governing direct mail solicitations and the restrictions on use of telephone equipment, *Id.* ¶8.7.; and

       b.     Not subcontract any of the functions to be performed by PRG in the Vendor Agreement. *Id.* ¶8.9.

30. At all times, Royal fully performed its obligations under the Vendor Agreement.

31. On or about December 13, 2016, PRG allegedly contacted Terrence Garvey ("Garvey") to solicit automotive warranty products, including a VSC to be administered by Royal (the "Call").

32. On or about December 13, 2016, PRG allegedly sold Garvey a VSC to be administered by Royal.

33. On or around April 4, 2017, Garvey initiated a lawsuit in the Northern District of Illinois against Royal, American Bankers Insurance Company of Florida and Assurant, Inc. (the "Insurance Companies") alleging the Call and the vendor's conduct violated Federal law— *Garvey v. American Bankers Inc. Co, et al.*, Case No. 17 cv 986 ("the Lawsuit").

34. The Lawsuit alleges that at the time of the Call, Garvey was registered on the National Do-Not-Call List.

35. The complaint did not allege which of Royal's vendors places the alleged Call.

36. Royal was forced to investigate the origin of the purported Call.

37. On or around May 9, 2017, Ghaneian signed a statement swearing PRG did not have any record of contacting Garvey and the PRG had no record that it dialed the number at issue.

38. On or before July 28, 2017, Ghaneian represented he had opt-in or consumer consent information that proved the Call did not violate Federal law.

39. On or around July 28, 2017, Royal requested that Defendants provide the information.

40. In response, Ghaneian changed his story once again. Ghaneian represented via

{00273625.DOCX /}6

email that he did not have opt-in or consumer consent information, but that the number at issue was not registered on the Do-Not-Call List at the time of the purported Call.

41.     Gheneian wrote that PRG scrubbed against the Do-Not-Call list.

42.     Ghaneian also claimed "We checked all the DNC files and Mr. Garvey placed himself after buying coverage."

43.     In an August 4, 2017 email, Ghaneian claimed he scrubbed the data himself.

44.     He insisted Garvey was not on the Do-Not-Call List at the time of the Call.

45.     Each of these statements was false and Gheneian knew they were false at the time he made them.

46.     Garvey's claims against Royal arise directly from and/or are the direct result of PRG's alleged Call to Garvey in violation of Federal law and the Vendor Agreement.

47.     In allegedly placing the Call and making false statements to Royal, PRG:

      a.    Breached the representations and warranties in the Vendor Agreement;

      b.    Breached its duties under the Vendor Agreement;

      c.    Committed wrongful acts;

      d.    Made material misrepresentations concerning the Programs and PRG's role and responsibilities under the Vendor Agreement; and,

      e.    Engaged in willful misconduct.

48.     The Vendor Agreement further provides in pertinent part: "[PRG] agrees to indemnify, hold harmless, and pay on behalf of Royal… any sums which [Royal, its directors, officers, and employees] shall become legally obligated to pay as damages, fines or judgments and defend them against causes of action which directly arise from or are caused by:

      i.    Any material inaccuracy or breach of the representations and warranties made by PRG as set forth in the Vendor Agreement;

      ii.    An breach of PRG's duties pursuant to the Vendor Agreement;

{00273625.DOCX /}7

     iii.     The wrongful or negligent acts or omissions of PRG; and

     iv.     The willful misconduct of PRG.

*Id.* ¶9.2.

49.     Accordingly, Royal made a demand upon PRG to indemnify and defend Royal against all Garvey's claims pursuant to the Vendor Agreement.

50.     Royal also put PRG on notice that it would be liable for the Insurance Companies' fees and costs arising from the Lawsuit.

51.     PRG failed or refused to indemnify and defend Royal and the Insurance Companies.

52.     On September 20, 2017, Royal's General Counsel terminated the Vendor Agreement. A true and correct copy of the Termination Letter is attached hereto as **Exhibit D**.

53.     Pursuant to Section 6.5 of the Vendor Agreement "All costs, expenses, and expenditures incurred by Royal in enforcing this Agreement as a result of any default or breach by [PRG], including without limitation, collection fees and reasonable attorney's fees, will be paid by [PRG].

54.     Royal has been damaged and continues to accrue damages by being forced to defend the Lawsuit.

55.     Further, Royal is liable for the Insurance Companies' fees and costs arising from the Lawsuit and therefore, has been damaged and continues to accrue damages by the Insurance Companies being forced to defend the Lawsuit.

**Count I**
**Breach of Contract**
**(PRG)**

56.    Royal realleges and incorporates Paragraphs 1 – 55 hereof, as if fully stated herein.

57.    On or around February 23, 2015, Royal and PRG executed the Vendor Agreement.

58.    The Vendor Agreement was supported by consideration.

59.    At all relevant times, Royal performed its part of the Vendor Agreement or was ready, willing, and able to perform its part of Vendor Agreement.

60.    At all relevant times, PRG knew and understood that the terms and guidelines of the Vendor Agreement were designed to ensure compliance with applicable state or Federal Law and to preserve and protect Royal's business reputation.

61.    Upon information and belief, PRG breached Paragraph 2 of the Vendor Agreement by:

     a.    Promoting, marketing and selling Programs related to Contracts outside of the approved jurisdiction;

     b.    Utilizing or employing sales or methodologies unauthorized under the terms and guidelines of the Vendor Agreement;

     c.    Utilizing methodologies that violate applicable state or Federal law, including robo-calling;

     d.    Utilizing methodologies that violate applicable state or Federal law, by contacting consumers who expressly affirmed his or her desire not to be contacted or called; and

     e.    Placing telephone calls to potential Contract Holders without the express consent of such potential Contract Holder.

62.    Upon information and belief, PRG violated its duties outlined in Paragraph 3 of the Vendor Agreement by:

{00273625.DOCX /}9

a.   Failing to assist prospective Contract Holders by explaining the terms of the Contract and correctly answering Contract related questions;

b.   Making misleading, inaccurate, and inconsistent statements and representations about Contracts;

c.   Failing to issue Contracts in accordance with the guidelines set out by Royal, including the Standards of Conduct provided to PRG by Royal;

d.   Acting inconsistently with the written guidelines or procedures provided by Royal; and

e.   Failing to store, retain, and make available to Royal in an electronic format records of all transactions between PRG and any consumer who purchases a Contract, and failing to provide Royal with all records of transactions between PRG and potential Contract Holders for the purpose of response to a lawsuit.

63.   PRG breached Paragraph 8 of the Vendor Agreement by:

a.   Failing to comply with all laws and administrative regulations that govern PRG's conduct, including but not limited to restrictions on the use of telephone equipment;

b.   On information and belief, subcontracting functions to be performed by PRG without Royal's written authorization.

64.   PRG breached Paragraph 9 of the Vendor Agreement by failing to defend Royal in the lawsuit brought against it in the Northern District of Illinois, *Garvey v. American Bankers Inc. Co, et al.* Case No. 17 cv 986, after Royal demanded PRG defend it because the Lawsuit was caused by PRG's:

a.   Breach of the representations and warranties in the Vendor Agreement;

b.   Breach of its duties under the Vendor Agreement;

c.   Wrongful acts of PRG and its directors, officers, and employees;

d.   Material misrepresentations made by PRG concerning the Programs and PRG's role and responsibilities under the Vendor Agreement; and,

e.   Willful misconduct.

65.   Royal suffered harm as a result of PRG's breach of the Vendor Agreement.

{00273625.DOCX /}10

WHEREFORE, by reason of the foregoing, Private Reserve Group Inc., d/b/a Auto Protection Services, d/b/a Auto Policy Center is liable for compensatory and punitive damages in excess of $50,000, including damage to Royal's business reputation, plus interest, and attorneys' fees and costs. Royal Administration Services, Inc. is entitled to recover damages for PRG's breach of the Vendor Agreement in an amount to be determined at trial, as well as interest and attorney's fees and costs.

**COUNT II**
**Breach of Contract**
**(Ghaneian)**

66.     Royal realleges and incorporates Paragraphs 1 – 65 hereof, as if fully stated herein.

67.     On or around February 23, 2015, Royal and PRG executed the Vendor Agreement;

68.     Ghaneian signed the Vendor Agreement as CEO of PRG.

69.     Ghaneian is also the owner and authorized agent of PRG.

70.     The Vendor Agreement was supported by consideration.

71.     At all relevant times, Royal performed its part of the Vendor Agreement or was ready, willing, and able to perform its part of Vendor Agreement.

72.     At all relevant times, Ghaneian knew and understood that the terms and guidelines of the Vendor Agreement were designed to ensure compliance with applicable state or Federal Law and to preserve and protect Royal's business reputation.

73.     Upon information and belief, PRG breached Paragraph 2 of the Vendor Agreement by:

      a.     Promoting, marketing and selling Programs related to Contracts outside of the approved jurisdiction;

{00273625.DOCX /}11

<table>
<tr><td>b.</td><td>Utilizing or employing sales or methodologies unauthorized under the terms and guidelines of the Vendor Agreement;</td></tr>
</table>

      b.    Utilizing or employing sales or methodologies unauthorized under the terms and guidelines of the Vendor Agreement;

      c.    Utilizing methodologies that violate applicable state or Federal law, including robo-calling;

      d.    Utilizing methodologies that violate applicable state or Federal law, by contacting consumers who expressly affirmed his or her desire not to be contacted or called;

      e.    Placing telephone calls to potential Contract Holders without the express consent of such potential Contract Holder.

74.    Upon information and belief, PRG violated its duties outlined in Paragraph 3 of the Vendor Agreement by:

      a.    Failing to assist prospective Contract Holders by explaining the terms of the Contract and correctly answering Contract related questions;

      b.    Making misleading, inaccurate, and inconsistent statements and representations about Contracts;

      c.    Failing to issue Contracts in accordance with the guidelines set out by Royal, including the Standards of Conduct provided to [PRG] by Royal;

      d.    Acting inconsistently with the written guidelines or procedures provided by Royal; and

      e.    Failing to store, retain, and make available to Royal in an electronic format records of all transactions between [PRG] and any consumer who purchases a Contract, and failing to provide Royal with all records of transactions between PRG and potential Contract Holders for the purpose of response to a lawsuit.

75.    PRG breached Paragraph 8 of the Vendor Agreement by:

      a.    Failing to comply with all laws and administrative regulations that govern PRG's conduct, including but not limited to restrictions on the use of telephone equipment;

      b.    On information and belief, subcontracting functions to be performed by PRG without Royal's written authorization.

76.    PRG breached Paragraph 9 of the Vendor Agreement by failing to defend Royal in the lawsuit brought against it in the Northern District of Illinois, *Garvey v. American Bankers*

*Inc. Co, et al.* Case No. 17 cv 986, after Royal demanded PRG defend it because the lawsuit was caused by PRG's:

      a.    Breach of the representations and warranties in the Vendor Agreement;

      b.    Breach of its duties under the Vendor Agreement;

      c.    Wrongful acts of PRG and its directors, officers, and employees;

      d.    Material misrepresentations made by PRG concerning the Programs and PRG's role and responsibilities under the Vendor Agreement; and,

      e.    Willful misconduct.

77.    Upon information and belief, Ghaneian is in total control and has complete ownership over PRG such that there is a unity of interest and ownership between Ghaneian and PRG.

78.    Upon information and belief, by reason of Ghaneian's control and relationship with PRG, Royal has suffered a fraudulent and injurious consequence.

79.    Upon information and belief, PRG is a shell corporation.

80.    Upon information and belief, Ghaneian purposely under-capitalized PRG, so that when confronted with liability for violations of Federal and State laws regarding marketing and solicitation practices, rather than pay a judgment, Ghaneian would avoid liability by initiating bankruptcy proceedings and continuing business as usual through another under-capitalized entity serving the same venture.

81.    Ghaneian used PRG and his other entities to engage in a confused intermingling of activities relating to the common enterprise of marketing and soliciting products and services with substantial disregard of the separate nature of the entities.

82.    Royal suffered harm as a result of PRG's breach of the Vendor Agreement.

83.    It would be unfair to treat the acts in questions as those of PRG alone.

WHEREFORE, by reason of the foregoing, in the alternative to Count I, Pejman Ghaneian is liable for compensatory and punitive damages in excess of $50,000, including damage to Royal's business reputation, plus interest, and attorneys' fees and costs. Royal Administration Services, Inc. is entitled to recover damages for Private Reserve Group Inc., d/b/a Auto Protection Services, d/b/a Auto Policy Center's breach of the Vendor Agreement from Pejman Ghaneian in an amount to be determined at trial, as well as interest and attorney's fees and costs.

**COUNT III**
**Declaratory Judgment**
**(PRG)**

84.     Royal realleges and incorporates Paragraphs 1 – 83 hereof, as if fully stated herein.

85.     On or around February 23, 2015, Royal and PRG executed the Vendor Agreement.

86.     On or around December 13, 2016, PRG allegedly made the Call.

87.     On or around December 13, 2016, PRG allegedly sold Garvey a VSC to be administered by Royal.

88.     On or around April 4, 2017, Garvey filed the Lawsuit in the Northern District of Illinois against Royal (and others) alleging the Call and PRG's conduct violated Federal law.

89.     After investigation, Royal learned PRG placed the Call to Garvey.

90.     Paragraph 9.2 of the Vendor Agreement requires PRG to:

indemnify, hol, d harmless, and pay on behalf of Royal and its directors, officers and employees, any sums which any of them shall become legally obligated to pay as damages, fines, or judgment . . . caused by (i) any material inaccuracy or breach of the representations and warranties made by [PRG] as set forth in this Agreement; (ii) any breach of [PRG's] duties pursuant to this Agreement, (iii) the wrongful or negligent acts or omissions of [PRG], its directors, officers,

{00273625.DOCX /}14

employees or third parties, including but not limited to, any material misrepresentations made by [PRG] concerning the Programs or Contracts; and (iv) the willful misconduct of [PRG] . . . .

91.     Royal demanded that PRG indemnify and defend Royal against Garvey's claims pursuant to Paragraph 9.2 of the Vendor Agreement.

92.     Royal also put PRG on notice that it would be liable for the Insurance Companies' fees and costs arising from the Lawsuit.

93.     PRG refused Royal's demand.

94.     A dispute exists as to PRG's obligation to indemnify Royal for any sums Royal may be obligated to pay as damages, fines or judgments as well as any legal fees or costs Royal and/or the Insurance Companies incur in the Lawsuit.

95.     As a result of the above and foregoing, there is an actual case in controversy between Royal and PRG regarding PRG's obligation to indemnify Royal.

WHEREFORE, Plaintiff Royal Administration Services, Inc., requests that this Honorable Court enter an order:

A.     Finding that the Vendor Agreement is a valid and enforceable contract;

B.     Finding that PRG must immediately reimburse Royal for any fees incurred defending itself in the Lawsuit;

C.     Finding PRG must indemnify Royal for any sums Royal may be obligated to pay as damages, fines, or judgments in the Lawsuit, including the fees and costs incurred by the Insurance Companies in defending itself in the Lawsuit or any damages, fines, or judgments against the Insurance Companies in the Lawsuit; and

D.     Granting any further and additional relief which may be appropriate and just.

**COUNT IV**
**Fraud**
**(Ghaneian)**

96.     Royal realleges and incorporates Paragraphs 1 – 95 hereof, as if fully stated herein.

97.     The complaint in the Lawsuit did not identify which vendor placed the alleged Call to Garvey.

98.     Royal investigated to determine if one of its vendors placed the call and if so which vendor was responsible.

99.     On May 9, 2017, Royal provided Ghaneian with an affidavit to review and sign if the statements were truthful.

100.    The affidavit asked:

    a.      "Do you have any record that your company, or any of its agents or affiliates, contacted the above-named consumer? If yes, please provide date(s) and time(s)."

    b.      "Do you have any record that your company, or any of its agents or affiliates, called the above-listed phone number? If yes, please provide date(s) and time(s).

101.    Ghaneian handwrote "No Record" in response to both questions.

102.    Ghaneian also completed the form by hand, and affirmed "I, Pejman Ghaneian, the owner of Private Reserve Group, Inc., hereby affirm that the above stated the information provided is true and accurate to the best of my knowledge as of the date written below [5/9/17]."

103.    These representations were false and known to be false by Ghaneian at the time they were made.

104.    At best, Ghaneian knew he had not reviewed the records yet represented no record existed; at worst, Ghaneian made the false statement knowing his company made the Call.

105.    On or before July 28, 2017, Ghaneian knowingly made another false statement.

106.　He claimed PRG had opt-in information or proof of consent to prove the Call did not violate Federal law.

107.　On July 28, 2017, Royal contacted Ghaneian via email and asked him to provide the opt-in information and any other proof of consent.

108.　Ghaneian responded that the alleged Call was not an opt-in but that he checked all of the Do-Not-Call files and claimed Garvey placed himself on the Do-Not-Call list after the alleged Call.

109.　On August 4, 2017, Ghaneian provided additional information to Royal concerning the Call.

110.　With respect to the data investigation, Ghaneian stated "I scrubbed it myself . . ."

111.　Ghaneian's representations regarding Garvey's status on the Do-Not-Call list and his representations regarding his investigation were false and known to be false by Ghaneian at the time they were made.

112.　In fact, Garvey's status on the Do-Not-Call list at the time of the Call is an objective and static fact. Accordingly, Ghaneian either lied about scrubbing the files to the Do-Not-Call list himself or knew the information was false.

113.　Royal relied upon the representations of Ghaneian and was thereby induced to spend and forced to incur unnecessary time, effort, and expense in the Litigation.

114.　By reason of the premises Royal suffered damages.

WHEREFORE, Plaintiff Royal Administration Services, Inc., requests that this Honorable Court enter judgment in its favor and against Defendant Pejman Ghaneian and order Pejman Ghaneian to pay compensatory damages in an amount to be proven at trial, including damage to Royal's business reputation, punitive damages, plus interest, and attorneys' fees and

costs, and any other relief this Honorable Court deems just and appropriate.

Dated: October 6, 2017

Respectfully submitted,

ROYAL ADMINISTRATION SERVICES,
INC.

By: _____
One of Its Attorneys

Meaghan Pomeroy (BBO# 681580)
51 Mill Street, Building F
Hanover, MA 02339
P: 800-871-0467, Extension 628
F: 781-261-2535
mlpomeroy@royaladmin.com

# **Exhibit A**

## ROYAL ADMINISTRATION
### Direct Marketer Preliminary Data Form

| Agent Name: | Jim Donovan | Date: | 2/25/2015 |
|---|---|---|---|

### Contact Data

| | |
|---|---|
| Company Name: | Private Reserve Group Inc. d/b/a Auto Protection Services |
| Company Address: | 2062 Business Center Drive #225 |
| State Company Is Organized In: | California |
| Company's Phone Number: | 866-634-7798 |
| Company's Website Address: | autopolicycenter.com |
| Company Officers: | Pejman Ghanelan |
| Company Directors: | Pejman Ghanelan |
| Email Addresses: | pighanelan@gmail.com; tawneypodergols@yahoo.com |
| Other companies owners are affiliated with: | NA |
| Any additional brokers? | no |

What methods are being used to generate sales **Mailings** **Direct Dial** **Internet** (please indicate any/all methods used).

Methods Used: _____All_____

⇨ **Fulfillment/DMS Company**

| Company Name: | Forte | Fees | $ |
|---|---|---|---|
| Contact Name: | Erika Walters | Contact Number: | |

⇨ **Third Party Funding Source**

| Company Name: | Omnisure |
|---|---|
| Contact Name: | Contact Number: |

### Upon return of this form please be sure to obtain & include the items listed below

| ⇨ | **Business Reference** |
|---|---|
| | Company Name: |
| | Contact Name:          Contact Number: |
| ⇨ | **Bank Reference:** |
| | Bank Name: |
| | Contact Name:          Contact Number: |
| ⇨ | **Current Balance Sheet** $ |
| ⇨ | On Site visit and review of company offices conducted by: |

**Please note that this form must be filled out completely and all information requested must be provided for consideration. Once all of the aforementioned documentation is received and verified, the company will be issued a Direct Marketer package.**

### Fax to Business Services at:
### 781-261-2574

| Form **W-9** | **Request for Taxpayer** | Give Form to the |
|---|---|---|
| (Rev. August 2013)<br>Department of the Treasury<br>Internal Revenue Service | **Identification Number and Certification** | requester. Do not<br>send to the IRS. |

Name (as shown on your income tax return)

PRIVATE RESERVE GROUP INC

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification:

☐ Individual/sole proprietor  ☒ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶

☐ Other (see instructions) ▶

Exemptions (see instructions):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

Address (number, street, and apt. or suite no.)

2002 Business Center DR #225

City, state, and ZIP code

IRVINE CA 92612

List account number(s) here (optional)

Requester's name and address (optional)

**Print or type**

**See Specific Instructions on page 2.**

## Part I — Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number

4 6 - 2 9 2 9 3 2 9

## Part II — Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below), and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

| Sign Here | Signature of U.S. person ▶ | Date ▶ 2/23/15 |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** The IRS has created a page on IRS.gov for information about Form W-9, at *www.irs.gov/w9*. Information about any future developments affecting Form W-9 (such as legislation enacted after we release it) will be posted on that page.

### Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, payments made to you in settlement of payment card and third party network transactions, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the

withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct.

**Note.** If you are a U.S. person and a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax under section 1446 on any foreign partners' share of effectively connected taxable income from such business. Further, in certain cases where a Form W-9 has not been received, the rules under section 1446 require a partnership to presume that a partner is a foreign person, and pay the section 1446 withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid section 1446 withholding on your share of partnership income.

Cat. No. 10231X                    Form **W-9** (Rev. 8-2013)

## VENDOR AGREEMENT

This Vendor Agreement (the **"Agreement"**) is entered into as of this 23rd day of February, 2015 (the **"Effective Date"**), by and between Royal Administration Services, Inc. (**"Royal"**), a Florida corporation, with its principal office located at 51 Mill Street, Building F, Hanover, MA 02339, and Private Reserve Group Inc., d/b/a Auto Protection Services (**"Vendor"**), a California corporation, with its principal office located at 2062 Business Center Drive #225, Irvine, CA 92612.

WHEREAS Royal is engaged in and has established expertise in the administration of certain service contract programs (the **"Programs"**) for eligible vehicles sold by certain direct marketers;

WHEREAS Vendor is in the business of marketing and selling vehicle service contracts (**"VSCs"**), similar to the Programs;

WHEREAS Royal, on a non-exclusive basis and subject to a Non-Disclosure Agreement to be executed contemporaneously with this Agreement, does hereby grant to Vendor, through Vendor's own personnel and employees, the right to market and solicit Programs on behalf of Royal; and

WHEREAS Vendor accepts such grant upon the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Definitions:**

   The following definitions shall apply to the terms used in this Agreement:

   **1.1. Administrator:** Royal.

   **1.2. Administrator Cost:** The portion of the Contract Charge to be paid to, or retained by, Administrator for the Contract, as set out in rate cards or price lists provided to Vendor from time to time by Administrator.

   **1.3. Administrator Payment:** The amount due to the Administrator for each Contract sold. All Administrator Payments shall be calculated using the Administrator Cost, plus any additional cost adjustments outlined for each customer thereafter.

   **1.4. Contract:** Each insured vehicle service contract included in the Programs administered by Administrator and sold by and/or through Vendor.

   **1.5. Contract Charge:** The total price to be paid by the Contract Holder for the Contract.

   **1.6. Contract Holder:** The party who has been issued a Contract by or through Vendor.

2. **Appointment of Vendor as a Distributor:**

Royal hereby appoints Vendor to be a distributor of the Programs for the sole purpose of promoting, marketing, and selling the Programs and related Contracts in those jurisdictions that Royal, in its sole discretion, will identify from time to time. Vendor accepts such appointment, and will perform those duties as set forth in this Agreement. Vendor acknowledges that it is only authorized to utilize or employ sales and marketing methodologies approved by Royal. Expressly excluded from these methodologies is any act or omission that violates applicable state or Federal law, including but not limited to "robo-calling", or contacting any consumer who has expressly affirmed his or her desire not to be contacted or called. To the extent that Vendor uses telephone equipment in the performance of its obligations herein, Vendor acknowledges that outbound telephone calls to any potential Contract Holder must be expressly authorized by such potential Contract Holder.

3. **Duties:**

**Royal's duties are as follows:**

3.1. To provide Vendor with Contract forms, coverage terms and conditions, and other materials (collectively the **"Supplies"**) reasonably required by Vendor for the marketing and issuing of the Contracts. Vendor shall bear all other costs associated with the marketing and sale of the Contracts. Vendor may, at its sole option and expense, design and produce sales brochures and other sales literature to be used in its performance of the obligations contained herein. Any such literature must be approved in writing by Royal prior to its use by Vendor. Royal reserves the right at all times to approve or reject such sales literature, in its sole discretion;

3.2. To provide all Program administration functions, including but not limited to claim adjudication and payment of claims, in accordance with directives determined in the sole discretion of the Program insurer or obligor;

3.3. To provide training as requested by Vendor;

3.4. To abide by all terms and conditions of any other agreement executed by Royal in connection with this Agreement; and

3.5. To approve all necessary sales and fulfillment materials to ensure compliance with all applicable laws.

**Vendor's duties are as follows:**

3.6. To assist prospective Contract Holders by explaining the terms of the Contract, and by correctly answering any Contract-related questions;

3.7. To make no statements or representations concerning any Contract which are misleading, inaccurate or inconsistent with the terms of this Agreement or any Contract;

RAS VA
PRG

2

**3.8.** To issue Contracts in accordance with guidelines set out by Royal, including the Standards of Conduct provided to Vendor by Royal. Vendor shall not take any actions inconsistent with any written guidelines or procedures provided by Royal;

**3.9.** To adhere to all Contract eligibility criteria established by Royal from time to time in its sole discretion, including but not limited to criteria concerning vehicle make, model, year, mileage and use;

**3.10.** To utilize only those scripts and materials approved by Royal, in its sole discretion;

**3.11.** To store, retain, and make available to Royal, in an electronic format acceptable to Royal, records of all transactions between Vendor and any consumer who purchases a Contract. Vendor shall also make available to Royal any records of transactions between Vendor and a potential Contract Holder if it is for the purpose of response to a lawsuit or regulatory or government agency complaint; and

**3.12.** To promptly notify Royal in writing in the event Vendor is or becomes subject to an inquiry or investigation by any local, state or federal government or regulatory agency, or any consumer or professional association, but only if such inquiry or investigation is related to the Programs or other related Agreements, or if such investigation has the potential to have a material adverse effect on Royal's operations.

## 4. Contract Charges and Refunds:

**4.1.** **No authority to alter Contract:** Vendor shall, on a weekly basis, present to Royal reports for all completed and issued Contract sales. Vendor has no authority to change, alter, vary, or waive any of the terms or conditions of the Program or Contracts. In the event Vendor changes, alters, varies or waives any of the terms or conditions of the Program or Contracts, Vendor shall be solely responsible to pay on behalf of Royal any and all sums due to a Contract Holder as a result of such actions by Vendor. In addition, Vendor hereby agrees to indemnify, hold harmless, and pay on behalf of Royal and its directors, officers and employees, any sums which any of them shall become legally obligated to pay as damages, fines or judgments and defend them against causes of action which directly arise from or are caused by such actions by Vendor, its directors, officers, employees or third parties.

**4.2.** **Fully-Paid Contracts:** In the event a Contract Holder pays in full at the time of a Contract sale, Vendor agrees to collect on behalf of Royal, the Administrator Payment which is due to Royal for each Contract sold. Vendor shall remit all sums due to Royal within ten days of Vendor's receipt of funds for the Contract.

**4.3.** **Contract Cancellations and Refunds:**

**A.** Vendor shall, on a semi-monthly basis, present to Royal any request for Contract cancellation(s). Vendor shall retain a copy of the Contract Holder's written request for cancellation and shall make such documentation available at Royal's request. If

RAS VA
PRG

3

Vendor is unable to obtain documentation from the customer, Vendor shall provide Royal with an internally-generated form in lieu of documentation from the customer listing, at a minimum, the Contract holder name, the Contract number, the date of cancellation, and the reason for cancellation.

B. Vendor shall provide notification to Royal upon receipt of request for Contract cancellation from any finance company or installment payment provider (the "Funding Source) that financed or advanced funds for the purchase of the Contract.

C. Upon any request by a Contract Holder or Funding Source to cancel a Contract, Vendor shall cancel such Contract and shall remit to Contract Holder or Funding Source the portion of the Contract Charge to be refunded under the terms of the Contract in accordance with applicable state law on behalf of Royal and Vendor.

D. When applicable, Vendor will invoice Royal for its pro-rata portion of the Administrator's Payment, which shall be refunded to the Contract Holder and/or Funding Source. Royal agrees to remit to Vendor the pro-rata portion within fifteen (15) days of receipt of the invoice.

E. In the event that any requests for cancellation of a Contract are made upon Royal, Royal shall forward such requests for processing by Vendor in accordance with the terms set forth herein.

F. Royal's liability for refunding its portion of the Contract Charge shall survive cancellation, termination, or expiration of this Agreement.

G. Vendor's liability for refunding its portion of a Contract Holder's or Funding Source refund shall survive cancellation, termination, or expiration of this Agreement.

4.4. Vendor will pay and/or cause to be collected from Contract Holders (if so permitted by applicable statutes, laws, rules and regulations), and to properly remit all federal, state and local taxes assessed or payable with respect to the sale or issuance of Contracts.

5. **Compensation:**

Vendor may determine the amount in Vendor's sole discretion of any commission or compensation, and add such amount to be included in the Contract Charge payable by the Contract Holder. Vendor agrees that Royal is not obligated and shall not provide any payment of such commissions or compensation to Vendor.

6. **Term and Cancellation:**

6.1. **Agreement Term:** Unless otherwise terminated pursuant to Section 6.3 of this Agreement, this Agreement shall run for a period of one (1) year commencing on the Effective Date.

RAS VA
PRG

4

6.2. **Renewals:** This Agreement shall automatically renew for successive periods of one (1) year thereafter unless and until either party gives written notice to the other of its intent to not renew this Agreement, at least sixty (60) days prior to the end of the then-current term.

6.3. **Termination:**

A. Notwithstanding anything contained herein to the contrary, either party may terminate this Agreement at any time and without cause, provided the cancelling party gives written notice of such cancellation thirty (30) days in advance to the non-cancelling party.

B. Royal shall have the right to immediately terminate this Agreement upon written notice to Vendor, if any of the following occurs:

    I. The assignment of any rights or the delegation of any duties under this Agreement by Vendor without the express written consent of Royal;

    II. The filing of a voluntary petition in bankruptcy or the execution by either party of an assignment for the benefit of creditors;

    III. The breach of any provision contained herein by Vendor; provided, however, that Vendor will be provided notice of the breach and fifteen (15) days to correct such breach; or

    IV. Upon the request of any Program insurer or obligor.

6.4. In the event of any termination of this Agreement, each party's respective obligations with regard to any Contract sold pursuant hereto shall continue in full force and effect until such obligation are discharged in accordance with the terms and conditions of such Contract.

6.5. All costs, expenses and expenditures incurred by Royal in enforcing this Agreement as a result of any default or breach by Vendor, including, without limitation, collection fees and reasonable attorney's fees, will be paid by Vendor.

7. **Notice:**

All notices, requests, demands and other communications required or permitted to be given or made under this Agreement shall be in writing unless otherwise provided for in this Agreement. Such notices will be deemed to have been given on the date of personal delivery or of deposit in the United States mail postage prepaid by registered or certified mail, return receipt requested, or the date of delivery as confirmed by any nationally recognized shipping service, and if addressed as follows:

RAS VA
PRG

5

<u>If to Royal:</u>

Royal Administration Services, Inc.
51 Mill Street
Building F
Hanover, MA 02339
Attn: Meaghan Pomeroy

<u>If to Vendor:</u>

Private Reserve Group, Inc.
2062 Business Center Drive #225
Irvine, CA 92612
Attn: Pejman Ghaneian

8. **<u>Representations and Warranties:</u>**

**<u>Royal hereby represents and warrants that the following are true and correct:</u>**

8.1. That Royal is a duly organized corporation in good standing in the State of Florida and that the execution of this Agreement is not in contravention of or in conflict with any terms or provisions of its Articles of Incorporation or By-laws or of the terms or conditions of any agreement to which it is a party;

8.2. That Royal and its employees have and will comply with all applicable laws and regulations governing the acceptance and issuance of any Program Contracts and shall remain in compliance with all applicable insurance laws and regulations governing such issuance of Contracts;

8.3. That the Programs are at all times approved for sale, and that such approval shall be maintained during the term of this Agreement and the term of any Contract;

8.4. That Royal has received the authority from the applicable Program insurer or obligor to provide the administration services specified in this Agreement and in any Contract; and

8.5. That Royal is permitted and/or licensed to provide the administrative services specified in this Agreement and in any Contract, and that such licensure shall be maintained during the term of this Agreement and during the term of any Contract.

**<u>Vendor hereby represents and warrants that the following are true and correct:</u>**

8.6. That Vendor is duly organized and in good standing in the State of California and that execution of this Agreement is not in contravention or in conflict with any term or provision of its Articles of Organization or By-laws or of the terms or conditions of any agreement or instrument to which it is a party to;

RAS VA
PRG

6

8.7. That Vendor, including its personnel and employees, will comply with all laws and administrative regulations that may govern the conduct of Vendor, including but not limited to requirements concerning licensure, those governing direct mail solicitations and the restrictions on use of telephone equipment. Upon request by Royal, Vendor shall provide copies of any and all required licenses;

8.8. That Vendor shall take direction from Royal and thereafter implement appropriate security programs and measures to: (*i*) protect the security and confidentiality of all consumer information as defined in Code of Federal Regulations (CFR) as amended from time to time; (*ii*) protect against anticipated threats or hazards to the security or integrity of such consumer information; and (*iii*) protect against unauthorized access to or use of such information that could result in harm or inconvenience to any consumer;

8.9. That Vendor shall not subcontract any of the functions (except Contract financing/funding, quality control and product fulfillment) to be performed by Vendor in this Agreement, unless expressly authorized in writing by Royal; and

8.10. That to the extent that Royal requires, in its sole discretion, adequate assurances from Vendor to secure its performance hereunder, Vendor shall provide such assurances, which may include but are not limited to, consent to Royal's periodic testing or auditing of Vendor to ensure compliance with the forgoing.

## 9. **Indemnification:**

9.1. Royal hereby agrees to indemnify, hold harmless, and pay on behalf of Vendor any sums which Vendor shall become legally obligated to pay as damages, fines or judgments and defend Vendor against causes of action which directly arise from or are caused by: (*i*) the wrongful or negligent acts or omissions of Royal, its directors, officers, or employees; (*ii*) "per se" actions brought in connection with the Program(s) and obligations pertaining thereto; (*iii*) any material inaccuracy or breach of the representations and warranties made by Royal as set forth in this Agreement; and (*iv*) the willful misconduct of Royal.

9.2. Vendor hereby agrees to indemnify, hold harmless, and pay on behalf of Royal and its directors, officers and employees, any sums which any of them shall become legally obligated to pay as damages, fines or judgments and defend them against causes of action which directly arise from or are caused by: (*i*) any material inaccuracy or breach of the representations and warranties made by Vendor as set forth in this Agreement; (*ii*) any breach of Vendor's duties pursuant to this Agreement, (*iii*) the wrongful or negligent acts or omissions of Vendor, its directors, officers, employees or third parties, including but not limited to, any material misrepresentations made by Vendor concerning the Programs or Contracts; and (*iv*) the willful misconduct of Vendor. This includes, but is not limited to, any and all Consumer or Funding Source claims or demands made to Royal for the pro-rata portion of the Contract Charge received by or advanced to Vendor.

9.3. The party seeking indemnification pursuant to this Section 9 shall have the right, at its own expense, to participate in the defense of any action, claim, or proceeding for which it is indemnified and which has been assumed in this obligation of indemnity hereunder.

9.4. Royal shall have the right to control the defense, consent to judgment, or agree to settle any such action, claim, or proceeding without the prior written consent of Vendor or the party from whom such indemnification is sought. The provisions of this section will survive the termination of this Agreement. All rights and remedies of the parties hereunder shall be cumulative and in addition to all right and remedies available to such parties at law or in equity.

## 10. Report and Records:

Vendor will render such reports and keep such records and business accounts as Royal may reasonably request. Royal shall provide to Vendor monthly statements of accounts and amounts due and payable to Royal (the **"Monthly Statement"**). Vendor shall provide payment in full to Royal of the Monthly Statement amount no later than two (2) business days after delivery to Vendor. Royal may, at its sole discretion, allow Vendor to pay via an installment or other payment plan.

## 11. Assignment:

Vendor may not assign this Agreement, any interest herein, or any benefits occurring hereunder (an **"Assignment"**), without prior written consent of Royal. Such consent shall not be unreasonably withheld. Failure to provide such consent or denial to an Assignment within thirty (30) days of receipt of notice of such Assignment shall be deemed acceptance by Royal.

Royal may assign this Agreement, any interest herein, or any benefits occurring hereunder at any time, without the prior written consent of Vendor. Royal shall provide notice to Vendor of such an assignment.

## 12. Entire Agreement; Modification:

This Agreement constitutes the entire and complete Agreement between the parties, and supersedes all previous written or oral agreements between the parties and their predecessors or assignors. This Agreement may not be changed or amended, nor may any of the rights hereunder be waived, except in writing signed by both parties.

## 13. Governing Law; Venue:

This Agreement shall be interpreted in accordance with the laws of the Commonwealth of Massachusetts.

The parties agree that any dispute between them arising out of, concerning, or in any way relating to this Agreement shall be submitted to a court of competent jurisdiction in Plymouth or Suffolk County, Massachusetts. Both parties expressly agree that they are subject to the personal

RAS VA
PRG

8

jurisdiction of the courts of the Commonwealth of Massachusetts and will not contest same.

**14. Severability:**

The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

**15. Authority of Vendor:**

Vendor shall have no authority to act on behalf of Royal, or the insurer or obligor of any Program, other than that expressly granted in this Agreement. Royal's failure or delay to insist upon compliance by Vendor with the terms of this Agreement shall not be construed as, or constitute, a waiver of any of the terms of this Agreement.

**16. Waiver:**

The failure of any party to require strict compliance with any of the terms or conditions of this Agreement or to exercise a right of termination of this Agreement shall not constitute a waiver of such rights.

**17. Execution in Counterparts:**

This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same document. A facsimile or electronic transmission of any party's signature on this Agreement shall be accepted as the original thereof and shall be binding.

*[PAGE ENDS HERE, SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**Private Reserve Group, Inc.**
**d/b/a Auto Protection Services**

By: Pejman Ghaneian, Its CEO
Duly Authorized

**Royal Administration Services, Inc.**

By: Richard McCabe, Its President
Duly Authorized

# NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT

This Non-Disclosure and Confidentiality Agreement (the **"Agreement"**) is entered into as of this 23rd day of February, 2015, by and between Royal Administration Services, Inc. (**"Royal"**), a Florida corporation, with its principal office located at 51 Mill Street, Building F, Hanover, MA 02339, and Private Reserve Group Inc., d/b/a Auto Protection Services (**"Vendor"**), a California corporation, with its principal office located at 2062 Business Center Drive #225, Irvine, CA 92612.

WHEREAS Royal provides the administration of certain vehicle service contracts (each a **"VSC"**) sold by select vendors in conjunction with certain Vendor Agreements, and

WHEREAS Vendor markets and sells VSCs on behalf of Royal, and

WHEREAS Royal desires to protect the confidential and proprietary information disclosed to Vendor in accordance with that certain Agreement between Royal and Vendor dated February 23, 2015 (the **"Vendor Agreement"**).

NOW, THEREFORE, the parties hereby agree as follows:

**1. SHARING OF CONFIDENTIAL INFORMATION:** In accordance with the terms of the Vendor Agreement, Royal shall provide to Vendor rates, guidelines and class schedules, and other rating information (**"Rating Information"**). In addition, Royal may provide business plans, marketing plans and other marketing information (**"Marketing Information"**) to Vendor (collectively, the Rating Information and Marketing Information shall be the **"Confidential Information"**).

Royal and Vendor agree that the sharing of the Confidential Information is necessary in order to facilitate the sale of the VSCs by Vendor. Royal and Vendor also agree that the Confidential Information contains proprietary and confidential material, and may be subject to applicable laws regarding secrecy of communications and trade secrets.

To facilitate the exchange of the Confidential Information, Vendor acknowledges and agrees as follows:

A. To limit access to the Confidential Information to authorized employees or independent contractors of Vendor (each an **"Employee"**) who have a need to know the Confidential Information in order for the Employee to participate in the facilitation of the sales of VSCs as described above;

B. To not disclose the Confidential Information to others, including other vendors of VSCs and non-authorized employees of Vendor, without the prior written approval and authorization of Royal;

C. To use the Confidential Information only for the purpose of work, services or analysis related to the sales of VSCs as described above and for other purposes only upon such terms as may be agreed upon between Royal and Vendor in writing; and

D. That the obligation to protect and not disclose the Confidential Information shall extend for a period of two (2) years following the date of termination or expiration of the Vendor Agreement.

**2. REMEDIES:** Royal and Vendor agree that a violation of any of the provisions of this Agreement will cause irreparable harm or injury to Royal and that Royal shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining the violating party from doing or continuing to do any such act and any other violations or threatened violations of the Agreement. In addition, in the event that either party receives a judgment in a court of competent jurisdiction relating to or arising out of this Agreement, the prevailing party shall be awarded their reasonable attorneys' fees and costs.

**3. ASSIGNMENT:** This Agreement shall not be assignable or transferable by either party without the prior written consent of the other. This Agreement shall be binding on the agents, successors, and assigns of Royal and Vendor.

**4. GOVERNING LAW:** This Agreement shall be construed in accordance with the laws of the Commonwealth of Massachusetts.

**5. ENTIRE AGREEMENT; MODIFICATION:** This Agreement is the entire agreement between the parties hereto with respect to the non-disclosure of Confidential Information described in this Agreement and supersedes all prior agreements and understandings with respect to this subject. Any amendment to this Agreement shall have no force unless it is in writing and executed by both parties.

**6. EXECUTION IN COUNTERPARTS:** This Agreement may be executed in counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same document.

*[PAGE ENDS HERE, SIGNATURE PAGE FOLLOWS]*

IN WITNESS THEREOF, this Agreement is executed as of the date first above written.

**Royal Administration Services, Inc.**

By: Richard McCabe

Title: President

**Private Reserve Group, Inc.**
**d/b/a Auto Protection Services**

By: Pejman Ghaneian

Title: CEO

Handling of Complaints…………………………………………………… 13

Identification of Patterns…………………………………………………… 13

Section 2: Marketers…………………………………………………………… 14

Basic Standards……………………………………………………………… 14

Business Names……………………………………………………… 14

Misrepresentations Prohibited…………………………………… 14

False Sense of Urgency……………………………………………… 15

False Sense of Exclusivity…………………………………………… 15

Limited Time Offer…………………………………………………… 15

Voice Confirmations………………………………………………… 15

Voice Confirmation Disclosure …………………………………… 16

Call Recording ………………………………………………………… 17

Contracts………………………………………………………………… 17

Opt-out Requests……………………………………………………… 17

Duplicative Coverage………………………………………………… 17

Additive Products……………………………………………………… 17

Criminal Background Checks……………………………………… 17

Audits…………………………………………………………………… 17

Advertising…………………………………………………………………… 18

Substantiation………………………………………………………… 18

Use of the Term "Free" …………………………………………… 18

Material Terms of Offer……………………………………………… 18

Informational Marketing Pieces…………………………………… 18

Mailing Lists and Lead Generation Materials…………………… 18

Financing Terms Prohibited………………………………………… 18

Vehicle Identification Number……………………………………… 19

Knowledge of Noncompliant Marketing Materials…………… 19

Offers…………………………………………………………………………… 19

General Requirements………………………………………………… 19

Disclosure of Material Terms and Conditions…………………… 19

Consumer's Affirmative Consent Required ……………………… 20

Outbound Telemarketing.............................................…..............................20

    Federal and State Do Not Call Laws…..............................................20

    Disclosures. ............................................................................ 21

    Caller ID…..................................................................................21

    Calling Time and/or Day Restrictions…. .............................. 21

    Automatic Telephone Dialing Systems ...............................22

    Prerecorded Messages.......................................................... 23

    Association Do Not Call List…................................................ 23

    Third Party Telemarketing Vendors…. ...............................23

    Negative Option Requirements….......................................... 24

Section 3: Administrators...................................................…...............24

    Basic Standards....................................................................... 24

    Contracts…...............................................................................24

    Customer Service…................................................................ 25

    Duplicative Coverage............................................................25

    Payment Plans........................................................................ 25

    Funding Disputes. ..................................................................25

    Compliance Officer…............................................................ 25

    Additive Products...................................................................25

    Criminal Background Checks. .............................................. 25

    Audits......................................................................................... 25

    Financial Audits ..................................................................... 26

    Business Relationships with Marketers. ...........................26

    Due Diligence .........................................................................26

    Compliance Attestations. ....................................................26

    Required Participation in the VPA Call Monitoring Program. ..............................26

    State Authorization Forms. ..................................................27

    Claims Handling .....................................................................27

    In General.................................................................................27

    Denial of Claim Based Solely on Non-Payment Prohibited. ...............................27

    Sharing of Claims Information. ...........................................27

Refund Policies and Procedures..................................................................... 27

    Minimum Full Refund Period…........................................................... 27

    Written Refund Policies and Procedures. ............................................27

    State Cancellation Laws…................................................................. 28

    Written Cancellation Fee Calculation…............................................ 28

    Cash Reserves…................................................................................ 28

Appendix A:  Voice Confirmation Disclosure...............................…...................29

# VEHICLE PROTECTION ASSOCIATION
## STANDARDS OF CONDUCT

### *Preamble*

Sound business practices and redundant standards result in business longevity and a solid reputation. Members of the Vehicle Protection Association ("Association" or "VPA") subscribe to this principle. Members agree to the Standards of Conduct hereto ensure that a consumer's experience with a Member is exemplary.

The Standards of Conduct are intended to guide the Association's Members in the ethical conduct of business with consumers. All Members must conduct business in a manner that supports the Standards' aims and principles. These Standards acknowledge that industry and consumers are best served when industry enacts self-regulatory measures, and as such, self-regulation is preferable to governmental mandates.

Because dishonest, misleading or offensive communications discredit the entire industry, Members should encourage all industry members to follow these Standards as well. The Association's goal is to enhance the customer experience by providing training, establishing fair standards, defining quality products and reliable services while establishing an effective self-regulatory mechanism.

### *Standards*

This document serves as the Association's Standards of Conduct for its members. The Standards now include specific sections for Marketers of Vehicle Service Contracts as well as for Administrators. All Members shall truthfully and accurately answer all inquiries, to the best of their knowledge, made by the Association during an investigation of a potential violation of these Standards.

These Standards create a floor, not a ceiling; therefore, Members may implement policies and procedures that provide greater consumer protections than these Standards. Where there is a conflict between these Standards and any state and/or federal rule governing practices and procedures, the controlling state or federal rule prevails. Whenever a question exists as to the scope of the applicability of any of these Standards, the assumption is that such Standard should be interpreted broadly to protect consumers' interests to the maximum extent possible.

The VPA is your resource to help you understand your legal obligations and these Standards. Please contact VPA legal counsel Helen Mac Murray with any questions at hmacmurray@mpslawyers.com or 614-939-9955.

# Section 1: General Standards for All Members

## 1. _Definitions_

1.1.  *"Administrator"* means a company that is designated to administer the terms and conditions of the service contract.

1.2.  *"Automatic Telephone Dialing System"* means equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and do dial such numbers.  This term includes predictive dialers.

1.3.  *"De-Certified Company"* means any company that previously qualified as a VPA Certified Company, whose certification has been revoked by the VPA for violation of these Standards or for any other reason.

1.4.  *"Extended Warranty"* or *"Warranty"* means a guarantee given to the purchaser by the seller or manufacturer stating that a product is reliable and free from known defects and that the seller or manufacturer will repair or replace defective parts within a given time limit and under certain conditions.  A Vehicle Service Contract is not an extended warranty.

1.5.  *"Fulfillment Company"* means any company responsible for sending a Vehicle Service Contract to a consumer on behalf of the Marketer and/or Administrator following the sale of the service contract.

1.6.  *"Marketing Methods"* mean the methods used by Marketers to contact consumers and/or induce consumers to contact them for the purpose of selling or offering to sell. Vehicle Service Contracts.  Marketing methods include, but are not limited to, direct mail, outbound telemarketing, email and internet marketing.

1.7.  *"Member"* or *"VPA Member Company"* means any company that has agreed to abide by the rules, regulations and standards set forth by the VPA, has paid the annual dues required for membership and whose membership has not lapsed or been revoked.  A Member may also qualify as a Marketer, Administrator, Payment Processor, VPA Certified Company, etc.

1.8.  *"Non-VPA Member"* means any company that operates in the Vehicle Service Contract industry, which does not qualify as a VPA Certified Company or has chosen not to join the VPA.

1.9.  *"Payment Plan"* means a plan offered to a consumer that allows the consumer to pay for a Vehicle Service Contract over a certain period of time.

1.10.  *"Payment Processor"* or *"Payment Processing Company"* means a company that collects payments from consumers who have elected to pay for a Vehicle Service Contract over a certain period of time.

1.11.    "*Provider*" means a company that is contractually obligated to the service contract holder under the terms of a Vehicle Service Contract.

1.12.    "*Reimbursement Insurer*" or "*Insurer*" means an insurance company that issues an insurance policy to a Provider under which it agrees, for the benefit of service contract holders, to discharge all of the obligations and liabilities of the Provider under the terms of the service contract in the event of nonperformance by the Provider.

1.13.    "*Service Contract Holder*" or "*Holder*" means the purchaser of a Vehicle Service Contract.

1.14.    "*Third Party Telemarketing Vendor*" or "*Vendor*" means a company that conducts outbound or inbound telemarketing campaigns on behalf of a Marketer or Administrator, using the Marketer's or Administrator's name, rather than its own name, during the telephone solicitations.

1.15.    "*Vehicle Service Contract*" or "*Service Contract*" means a contract or agreement for a separately stated consideration and for a specific duration to perform the repair, replacement, or maintenance of a motor vehicle or indemnification for repair, replacement, or maintenance, for the operational or structural failure due to a defect in materials or workmanship and sometimes cover normal wear and tear.

1.16.    "*Vehicle Service Contract Marketer*" or "*Marketer*" means a company that markets, sells or offers to sell Vehicle Service Contracts to consumers, which is not contractually obligated to the service contract holder under the terms of the Vehicle Service Contracts it sells.

1.17.    "*VPA Call Monitoring Program*" means the program where the VPA randomly selects contracts that were previously sold to consumers by Member and Non-Member Marketers obtains recordings of the sales calls and assesses compliance of such calls with the VPA Standards of Conduct.

1.18.    "*VPA Certification Program*" means the program where Members apply to the VPA for certification and undergo an independent third party assessment of their business practices against the VPA Standards of Conduct.

1.19.    "*VPA Certified Company*" or "*Certified Company*" means any Member that has successfully undergone the VPA certification process by an independent auditor, has been approved for certification by the VPA Board of Directors and whose certification has not lapsed or been revoked.

1.20.    "*VPA Pre-Certified Company*" or "*Pre-Certified Company*" means any Member that has completed the required pre-certification audit forms, paid the retainer fee to the independent VPA audit firm, and scheduled the initial visit to their facility by the VPA audit firm.

## 2. *Basic Standards*

2.1.    Compliance with Federal and State Laws.  Members shall operate in accordance with laws and regulations of the Federal Trade Commission, the Federal Communications Commission, the Federal Reserve Board, the United States Postal Service and all other applicable federal, state, and local regulations and laws.

    2.1.1.    *Licensing*.  Members shall meet all state licensing and marketing requirements applicable to the industry.

    2.1.2.   *Sample Contracts*.  Members shall post a sample copy of all contracts they currently offer online.

        2.1.2.1.    Members shall direct prospective purchasers, who request to see a sample contract prior to making a purchase, to the web address where these contracts are displayed.

        2.1.2.2.    If requested, Members shall send a copy of the contract being offered to the consumer via electronic mail or by facsimile.

2.2.    Adequate Cash Reserves.  Members shall ensure that they have adequate cash reserves to:  (1) make timely refunds to all consumers entitled to such refunds pursuant to the terms of the Vehicle Service Contract and/or applicable state and federal laws; and (2) to fund claims submitted by Service Contract Holders (if the Member is an Administrator); and 3) reserve and holdback.  If the Member is providing refunds directly to consumers, the Member shall be sufficiently reserved between the Administrator and the Marketer to provide the full refund due.

    2.2.1.   *Customer Service*.  Members shall employ an adequate staff to promptly respond to customer service inquiries and telephone calls with an appropriate mechanism in place for escalation to a supervisor who has authority to resolve the issue.

    2.2.2.   *Compliance Officer*.  Members shall appoint a representative of the company to serve as its compliance officer.  The compliance officer's duties shall include ensuring that the Member is complying with all state and federal laws and regulations, as well as the guidelines set forth in the Standards of Conduct.

2.3.    Due Diligence.  Members shall conduct due diligence to ensure that companies with whom they do business are also complying with the law.  Merely relying on a contract provision requiring the parties to comply with all applicable laws, when the member has reason to believe that a business party is not operating consistent with legal requirements, is not sufficient to meet this standard.

    2.3.1.   *Financial Stability*.  Members shall ensure each business with which they conduct business has adequate cash reserves to issue refunds and/or pay claims.

3. ***Refund Policies and Procedures***

    3.1.   <u>Disclosure of Refund Policy</u>. Refund policies, including whether any administrative or cancellation fees will/may apply, shall be clearly and conspicuously disclosed to consumers prior to the sale of any product of service.

    3.2.   <u>Minimum Full Refund Period</u>. Members shall honor all consumer refund requests in full made within thirty days of the date they sold the contract.

        3.2.1.   *Down Payment Refunds*. If the consumer has only paid the initial deposit, Members shall provide the refund within five (5) business days, if made by credit card; and within thirty (30) days if made by check or ACH.

        3.2.2.   *Other Refunds*. If the consumer has also made subsequent payments, the Member shall provide the refund within thirty (30) days from the date they receive the completed notice of cancellation with odometer information.

    3.3.   <u>State Cancellation Laws</u>. Members must be aware of and comply with all applicable state laws governing refunds and/or applicable three (3) day right to cancel laws.

    3.4.   <u>Written Cancellation Fee Calculation</u>. Upon request, Members shall provide a written cancellation fee calculation and state the information upon which they base the calculations.

    3.5.   <u>Cash Reserves</u>. Members shall maintain adequate cash reserves to issue timely refunds to all consumers that are entitled to a refund pursuant to the Member's cancellation policy and/or applicable state and federal laws.

4. ***Guidelines for using the term "Warranty"***

    4.1.   Members may keep URLs they have previously used that contain the word "warranty" so long as the content of the website (including the name used) meets the guidelines below. Newly created websites may not use the word "warranty" in its URL.

    4.2.   Members shall not deceptively refer to any business name known to the consumer that contains the word "warranty," "dealer" or "manufacturer."

    4.3.   Members may use the term "warranty" to refer to the manufacturer's warranty.

    4.4.   Members shall not directly refer to the Vehicle Service Contracts as "warranties" or "extended warranties."

4.5.     Members may use a term such as "Vehicle Service Contract" coupled with a parenthetical explanation containing the term "warranty" such as "(f/k/a an extended warranty)" or "(commonly referred to as an extended warranty)" to describe Vehicle Service Contracts, so long as the disclosure requirements outlined in Standard 4.12 (below) are met.  In the context of press releases, articles and/or blogs on a member's website, the required disclosure may be provided clearly and conspicuously in one location rather than on each individual press release, article or blog entry.

4.6.     Members shall use the required disclosures outlined in Standard 4.12 (below) if they post customer testimonials on their website wherein customers refer to their Vehicle Service Contracts as a "warranty" or "extended warranty."

4.7.     Members may use terms such as "warranty" and/or "extended warranty" to educate consumers on the difference between a warranty and Vehicle Service Contract (e.g. see the disclosure in Standard 4.12 below).

4.8.     Members shall not refer to themselves or any company they conduct business with as a "warranty company" or any similar term that containing the term "warranty."

4.9.     Members shall not refer to their employees or the employees of any company they conduct business with as "warranty specialists," "warranty consultants" or any similar term that contains the term "warranty."

4.10.    Members may use previously recorded audio/visual endorsements from public figures that use the word "warranty" so long as the disclosure requirements outlined in Standard 4.12 (below) are met.  Newly created audio/visual endorsements shall not use the word "warranty" to describe a Vehicle Service Contract.

4.11.    For websites, Members may use the terms "warranty" or "extended warranty" for purposes of search engine marketing (i.e. pay-per-click advertisements), if the content of their website(s) complies with the Standards and the disclosure in Standard 4.12 (below) is prominently displayed on the homepage of the Member's website.

4.12.    <u>Required Disclosure.</u> If a member uses the term "warranty" or "extended warranty" in any manner that requires a disclosure pursuant to Standard 4 (above), the following disclosure shall be ***clearly and conspicuously*** placed on all landing pages where the term is used:

A Vehicle Service Contract (VSC) is often referred to as an "extended warranty," but it is not a warranty. A VSC does, however, provide repair coverage for your vehicle after the manufacturer's warranty expires. A VSC is a contract between you and a VSC provider or administrator that states what is a covered repair and what is not. If applicable, add: [Company name] is a marketer of VSCs and does not sell warranties. VSCs sold by [Company name] are agreements between consumers and third party VSC providers, not [Company name].

For purposes of these guidelines, "clearly and conspicuously placed" means:

- In close proximity to the term that triggers the required disclosure (e.g. "warranty"). Making disclosures at the bottom of the page with or without the use of a footnote is not sufficient.

- Using a font and color that contrasts from the background on which the disclosure appears.

- Not otherwise obscured by the background, surrounding text, graphics, illustrations, etc.

## 5. *Security of Customer Information*

5.1. General Requirement. Members shall adequately protect all nonpublic consumer/customer personal information regardless of whether it is handled or maintained in paper or electronic format.

5.2. Written Information Security Program. In order to adequately protect this information, Members shall maintain a written information security program ("ISP"). The ISP shall contain administrative, technical and physical safeguards that are appropriate to the size, complexity, nature and scope of the business and the sensitivity of the information and meet the requirements outlined below.

5.2.1. *Plan Coordinator.* Members' ISPs shall designate one or more employees to coordinate, monitor and revise the program.

5.2.2. *Identification of Risks.* Members' ISPs shall identify reasonably foreseeable internal and external risks to the security, confidentiality and integrity of the customer information.

5.2.3. *Employee Training.* Members' ISPs shall provide for recurring employee training to ensure the ISP is fully implemented and consumers' personal information is protected.

5.2.4. *Required Systems.* Members' ISPs shall identify the information systems necessary to detect, prevent and respond to attacks, intrusions and other system failures.

5.2.5. *Testing and Monitoring.* Members' ISPs shall set forth regular testing or monitoring procedures that will be used to evaluate the effectiveness of the program.

5.2.6. *Evaluation of Program.* Members' ISPs shall provide for the evaluation and adjustment of the program as results of the testing and monitoring dictate or other changes such as a business model change, facility change, etc.

5.2.7. *Disposal of Information.* Members' ISPs shall ensure that personal information is adequately and securely disposed of at the end of its useful life.

    5.2.8.  *Social Security Numbers*. Members shall use Social Security Numbers only when necessary and in compliance with all state restrictions on display and use of social security numbers.

5.3.   <u>Service Providers</u>. Members shall oversee service providers who have access to nonpublic personal information, by taking reasonable steps to select and retain service providers that are capable of maintaining the security standards set forth herein.

    5.3.1.  Members shall require service providers by contract to implement and maintain the security standards set forth herein.

## 6. *Privacy Policy and Data Collection Practices*

6.1.   <u>Online Privacy Policy</u>. If a Member has a website, the Member shall have a privacy policy and shall clearly and conspicuously post a copy of the policy online.

    6.1.1.  *Placement*. Members shall include a clear and conspicuous hyperlink to its privacy policy on all offer pages and all landing pages where the consumer's personal information is requested.

    6.1.2.  *Notice Disclosures*. All notice disclosures should appear in or be linked to every consumer data collection site/application and the Member's website

6.2.   <u>Content of Privacy Policy</u>. Members' privacy policies shall disclose and outline the company's practice of data collection, usage, and sharing ("Data Practices"). Data Practices should be easy to find, easy to read and easy for consumers to act upon.

6.3.   <u>Sale of Personal Information</u>. Members shall not sell consumers' personal information to other companies for marketing purposes without the consumer's knowledge or choice. Notice in a privacy policy that complies with these Standards shall suffice as such knowledge and choice.

6.4.   <u>Notification of Privacy Policy Changes</u>. Members shall provide consumers with reasonable and adequate notice of any material privacy policy change.

    6.4.1.  *Online Notification*. Members shall have a notice on their home page that their privacy policy has been materially updated and should highlight the updates and list the dates the revisions were made at the top of their privacy policy.

    6.4.2.  *E-mail Notification*. Members should also strongly consider email notification of material changes to all consumers covered by the original privacy policy.

6.5.   <u>Controls</u>. Members shall have both technical and management controls in place to comply with their respective privacy policy.

6.6.   <u>Data Collection</u>. Members shall ensure that personal data is gathered in compliance with applicable federal and state laws and regulations, as well as the best practices outlined in these Standards.

6.6.1. *DMV Data*. Members shall not use consumers' personal information obtained from a state department of motor vehicles for any unauthorized use in violation of 18 U.S.C. 2721 *et seq.* or any similar state laws.

6.6.2. *Consumer Reports*. Members shall not use information obtained from a consumer credit report unless it is used for a "permissible purpose" as defined under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*

6.7. <u>Evaluation of Policy and Procedures</u>. Members shall conduct a regular, periodic evaluation of their privacy policy and data protection procedures to ensure compliance.

# 7. *Consumer Complaint Process*

7.1. <u>Written Policy and Procedures</u>. Members shall have a written consumer complaint process in place to address complaints received from consumers, the Better Business Bureau or regulatory agencies.

7.2. <u>Handling of Complaints</u>. Members shall address all complaints received in a prompt, courteous and professional manner and shall make a good faith effort to resolve every complaint. Members shall escalate complaint handling to an appropriate supervisor who has the authority to decide issues when consumers request such an action.

7.2.1. *Third-Party Complaints*. Members that receive complaints involving a third party (e.g. a Marketer receives a complaint regarding a claim denied by an Administrator) shall share that information within five business days with all parties involved in the complaint including the finance company, administrator, fulfillment company, and the Association..

7.2.2. *Better Business Bureau and Regulator Complaints*. Members who receive a complaint from a third party such as the Better Business Bureau or state attorney general shall provide the complaint to the Association within five business days, and shall respond to the complaint within the timeframe that the third party requests.

7.3. <u>Identification of Patterns</u>. Members' complaint processes shall be such that patterns of problems or severe problems are identified and addressed.

7.3.1. Senior management, owners and principals shall be kept apprised of all such problems identified by consumer complaints.

7.3.2. Members shall create procedures that require the Member to investigate the cause of the problem and to correct the issues identified within a reasonable time period.

## Section 2: Standards for Marketers

8. *Basic Standards*

8.1.  <u>Business Names</u>.  Marketers shall not conduct business in a name known to the consumer that contains the word "warranty."  Marketers shall register all names with which they conduct business ("DBA names") with the appropriate agency(ies) in the states it is required to do so.

   8.1.1.  Marketers shall not conduct business under any deceptive or misleading DBA name(s), use a DBA name that is registered to another business and/or use any DBA name that is deceptively similar to a DBA name used by another similar business.

   8.1.2.  Marketers shall not use DBA names that contain words such as "warranty," "dealer," "dealership," "manufacturer" (including actual manufacturer's name; *e.g.* "Ford") or any other words that falsely imply that the company is somehow associated with the manufacturer of the motor vehicle.

   8.1.3.  Marketers shall not use any DBA that contains words such as "insurance," "surety," "mutual" or any other words descriptive of the insurance, casualty or surety business, or a name deceptively similar to the name or description of any insurance or surety corporation.

8.2.  <u>Misrepresentations Prohibited</u>.  Marketers shall not misrepresent the nature of the products sold and/or the coverage offered from the perspective of the totality of the circumstances.

   8.2.1.  *Scope of Coverage*.  Marketers shall not misrepresent the scope of Vehicle Service Contracts they sell by stating that they offer "bumper to bumper" coverage or use similar terms to represent or imply that all parts are covered under the contract.

   8.2.2.  *Warranty References*.  Marketers shall not refer to a Vehicle Service Contract as a "warranty" or "extended warranty." Marketers may use these words to describe the manufacturer's coverage or as otherwise outlined in Standard 4.

   8.2.3.  *References to Manufacturers*.  Marketers shall not communicate with customers so as to infer that they are agents of the vehicle manufacturer if such is not the case.  If Marketer refers to a manufacturer or dealer in a marketing piece, it must also disclose in the piece in a clear and conspicuous manner that it is not affiliated with those entities or state that it is an independent company selling Vehicle Service Contracts.

8.2.4. *Insurance Terms.* Marketers shall not use in their advertisements, sales solicitations or any other description of their products, words such as "insurance," "surety," "mutual" or any other words descriptive of the insurance, casualty or surety business.

8.3.  <u>False Sense of Urgency</u>.  Marketers shall not create a *false* sense of urgency in their marketing materials. Marketers must be able to substantiate any claim of urgency *before* they distribute a marketing piece.  Marketers shall not use language that indicates that a consumer's warranty is expiring unless they possess information that establishes that the consumer's current warranty will expire within a reasonable time in the near future.

8.4. <u>False Sense of Exclusivity</u>.  Marketers shall not make an offer that gives a *false* sense of exclusivity.  For example, Marketer shall not claim that an offer is "exclusive" or that the consumer was "preselected" unless that is true and the Marketer only makes the offer to a select number of potential customers.

8.5. <u>Limited Time Offers</u>.  Marketers shall not indicate that an offer is for "a limited time" or that the offer "will expire" unless Marketer is prepared to change or refuse to honor the original offer after the stated time period ends and be able to substantiate a reasonable limited time for the offer.

8.5.1.  Marketers may also use this phrase if they have actual knowledge that the consumer's vehicle is within 7500 miles or 6 months of no longer qualifying for exclusionary coverage or if they have actual knowledge of an impending rate increase.

8.6. <u>Voice Confirmations</u>.  Marketers shall make a voice confirmation disclosure for all phone sales that includes all of the information contained in Appendix A, including but not limited to, the requirement to obtain express, affirmative consent from the consumer to charge his or her credit or debit card.  Appendix A represents the minimum confirmation disclosure requirements.  Marketers may include additional disclosures not contained therein.

## VOICE CONFIRMATION DISCLOSURE

Congratulations on the purchase of your *Admin, Inc.* protection plan for your vehicle from *XYZ Seller*! You have selected *X Plan Brand* for_____months or_____miles, whichever occurs first. During this period you will be provided *Y Coverage Type plan* on your vehicle. Your protection plan has a waiting period, so coverage will commence at the sooner of the passing of_____days and_____miles from your current odometer statement. (This should be consistent with the Vehicle Service Contract sold).

You will receive a full contract containing all terms and conditions in the mail shortly. Please contact us at *(800) 123-4567* if you do not receive your package. Upon receipt of your contract, please be sure to review the coverage, terms, conditions and exclusions to confirm it meets your needs. You have_____days from today, *(June 1st)*, to review your coverage and are entitled to a full refund during this period. (This should be consistent with the Vehicle Service Contract sold). After 30 days, you are entitled to a pro-rata refund, subject to claims paid and any cancellation fees outlined in the contract.

The contact information we have on file is *Mr. John Q. Customer* located at *123 Main Street, City, State 12345*. Your email address is *John.Smith@email.com*. You have elected a down payment of *$200* and *12* installment payments of *$150.00* which will be processed by our partner *Payment Processor, Inc.*

Your monthly payment will be charged to your *Visa* credit card account number ending in *1234* on or around the *5th day of each month* starting *July 5, 2009*. At this time, we will need your voice verification of these terms and conditions and to authorize the charges to your account. Do you authorize a charge today of $200? Do you authorize 12 monthly charges of $150 beginning on July 5 and each month thereafter until your balance is paid in full? (Need to receive a verbal YES).

X Plan Brand = Administrator's Brand Name

Y Coverage Type Options: Exclusionary, Named Component, Power train

8.7.    <u>Call Recording</u>.  Marketers shall record all phone calls from start to finish, including but not limited to, the voice confirmation disclosure and corresponding consumer consent.

    8.7.1.  *Availability of Recordings.*  Recordings shall be made available on demand to the Administrator, Payment Processing Company and the Association.

    8.7.2.  *PCI Compliance.*  The equipment used for the recording must be PCI compliant so that the consumer's credit card number or ACH information are protected.

    8.7.3.  *Disclosure of Recording to Consumers.*  The fact that the call is being recorded shall be disclosed to the consumer at the beginning of the call.

    8.7.4.  *Pausing.*  Customer and/or sales representatives shall not have the ability to pause the recording other than to avoid recording credit card information.

8.8.    <u>Contracts</u>.  Marketers shall provide the purchaser with a copy of the contract electronically or mail the contract to the consumer within three (3) business days of when the consumer agrees to purchase the contract.  Upon request, Marketers shall make contracts available to the VPA

    8.8.1.  *Evidence of Shipment.*  Marketers or their Fulfillment Companies shall maintain evidence that they sent the consumer their contract and when it was sent.

8.9.    <u>Opt-out Requests</u>.  Marketers shall permit and honor a consumer's request to opt out of receiving future marketing pieces and/or telephone solicitations.

8.10.   <u>Duplicative Coverage</u>.  Marketers shall not knowingly sell a consumer duplicative coverage of a warranty or service contract that the consumer already possesses.

8.11.   <u>Criminal Background Checks</u>.  Marketers shall conduct criminal background checks on all newly hired employees.

8.12.   <u>Audits</u>.  Marketers shall provide the Association with reasonable access to its facilities, policies, procedures and Marketing Methods for purposes of assessing the Marketer's compliance with these Standards in connection with certification, certification renewal and/or Association investigations.

    8.12.1. *Call Monitoring.*  Live call monitoring shall be made available to the Association and/or its auditor(s) for purposes of such audits and/or investigations.

    8.12.2. *Mailers/Advertisements.*  Upon request, Marketers shall provide the Association with copies of all mail pieces, general media advertisements and/or lead generation materials, including URL addresses, they have used within the previous two (2) years.

## 9. *Advertising*

9.1. <u>Substantiation</u>. Marketers must possess adequate substantiation, prior to making claims or offers. Marketers should have advertising materials reviewed by an attorney experienced in these laws or by the Marketer's compliance officer.

9.2. <u>Use of the Term "Free"</u>. When using the term "free" or "complimentary" or other similar terms, Marketers shall ensure proper disclosures are made in proximity to the term, if some form of action is required of the consumer to receive the offer.

9.3. <u>Material Terms of Offer</u>. If a Marketer makes a specific offer in a marketing piece, it must clearly and conspicuously disclose all the material terms and limitations of the offer. These terms shall not be contradicted by other statements, representations or disclaimers.

9.4. <u>Informational Marketing Pieces</u>. If a Marketer's marketing piece contains informational material, such as the fact that a recall exists for the consumer's auto, the Marketer must clearly and conspicuously disclose that if the consumer calls the Marketer for information, the Marketer will be offering for sale a Vehicle Service Contract.

9.5. <u>Mailing Lists and Lead Generation Materials</u>. Marketers shall conduct sufficient due diligence to have reasonable certainty that mailing lists they purchase contain legally obtained consumer information and that all leads are generated in a lawful manner. Reasonable due diligence includes contractually requiring consumer data to be obtained in a lawful manner and obtaining executed affidavits or other documentation from list providers and/or lead generators indicating that the consumer data being provided was obtained in a lawful manner. Marketers must ensure that a third party vendor who sends them transfer calls or leads obtained through outbound telemarketing complies with all of the VPA Standards for telemarketing found in Section 11.

9.6. <u>Financing Terms Prohibited</u>. Since service contracts are not financed, Marketers shall not represent that the contracts are financed and shall make no reference to interest rates or charges.

9.6.1. *No Fee Payment Plan*. For contracts sold that are not paid in full at the time of purchase, Marketers shall describe the payment as a "no fee payment plan" or another similar non-financing term.

9.7. <u>Vehicle Identification Numbers</u>. Unless an existing business relationship (EBR) exists, Marketers shall not use full vehicle identification numbers (VINs) in their promotional materials. If a VIN is used in promotional materials without an EBR, it shall be limited to the first 12 digits.

9.8. <u>Knowledge of Noncompliant Marketing Materials</u>. Marketers with specific knowledge regarding other Members and/or Non-VPA Members that are using marketing materials that do not comply with these Standards and/or federal or state laws shall report such noncompliance to the VPA.

# 10. *Offers*

10.1. <u>General Requirements</u>.

10.1.1. All offers shall be disclosed to a prospective customer in a clear, honest, and complete manner.

10.1.2. The service contracts that Marketers sell shall be consistent with the product that they represent to the consumer.

10.2. <u>Disclosure of Material Terms and Conditions</u>. Marketers shall clearly and conspicuously disclose the material terms and conditions of the offer before obtaining the consumer's consent, including:

10.2.1. *The Sellers' Identities and Contact Information.* The identity of the Marketer and Administrator and contact information for service or cancellation for both.

10.2.2. *A Description of the Goods or Services Being Offered.* The description of the goods or services being offered shall include the following information:

> ➤ The type of coverage;

> ➤ The number of miles and/or years that the contract covers;

> ➤ The deductible, if any;

> ➤ If a waiting period exists before the consumer can make a claim under the contract and how that period is determined;

> ➤ Whether the contract is transferable to a subsequent purchaser;

> ➤ Whether the contract is refundable and if so, the time frame within which the consumer cancel for a full refund;

> ➤ Whether the consumer must perform mandatory maintenance;

> ➤ Any dollar limitation on the total amount of claims; and

> ➤ Whether repairs must be pre-approved by the claims administrator.

10.2.3. *Payment and Billing Information.* Payment and billing information disclosed to consumers shall include the following information:

> ➢ The price or the range of prices of products or services purchased by the consumer, including whether there are any additional charges including a deposit;

> ➢ Whether the consumer will be billed or automatically charged;

> ➢ When and how frequently the consumer will be billed or charged; and

> ➢ The entity that will process the consumer's payments.

10.2.4. *Cancellation and Refund Information.* Cancellation and billing information disclosed to consumers shall include the following:

> ➢ The fact that the consumer must take affirmative action to cancel in order to avoid future billing or charges;

> ➢ The specific and easy steps that consumers should follow to cancel the plan and avoid the charges;

> ➢ The time period, if any, within which the consumer must cancel; and

> ➢ The fact that a cancellation fee will or may apply if the consumer cancels after the mandatory 30 day full refund period.

10.3. <u>Consumer's Affirmative Consent Required</u>. In order to obtain the consumer's consent, Marketers must receive an affirmative response that the consumer accepts the material terms and conditions of the offer as described above. It is appropriate to group these disclosures together and obtain affirmative consent in that manner.

# 11. *Outbound Telemarketing*

11.1. <u>Federal and State Do Not Call Laws</u>. Marketers shall follow all state and federal Do Not Call (DNC) laws and regulations.

11.1.1. *Federal DNC Regulations.* Marketers shall not conduct any outbound telemarketing unless they have obtained a Subscription Account Number (SAN) by registering with the Federal Trade Commission and scrub all outbound telemarketing calls against the National DNC Registry or they are exempt from these requirements.

11.1.1.1. Under federal regulations, Marketers that only make outbound telemarketing calls to consumers who have provided express written consent to be contacted and/or consumers with whom they have established business relationships are exempt from the requirements to purchase a SAN and scrub against the National DNC Registry.

11.1.1.2. If a Marketer believes that it is exempt from a law, the burden is on the Marketer to prove that the exemption applies to their company.

11.1.2. *State DNC Laws.* Marketers shall not conduct any outbound telemarketing unless they have policies and procedures in place to comply with state DNC laws and regulations, which may require telemarketers to scrub non-exempt outbound telemarketing calls against the National DNC Registry or against a DNC list maintained by the state.

11.1.2.1. Marketers recognize that several states have DNC laws that are more restrictive (i.e. fewer exemptions apply) than provided under federal regulations and shall comply with all such state laws.

11.1.2.2. Marketers recognize that state DNC laws that are more restrictive than federal regulations apply even where the list used by the state is the National DNC Registry. As such, a Marketer may be exempt from scrubbing against the National DNC Registry under federal regulations but required to scrub against the Registry pursuant to state law.

11.1.2.3. If a Marketer believes that it is exempt from a law, the burden is on the Marketer to prove that the exemption applies to their company.

11.1.3. *Internal DNC List.* Marketers shall maintain a company-specific internal DNC list and scrub all outbound telemarketing calls against this list.

11.1.3.1. Internal DNC requests apply to the telephone number provided during the request, not the specific person making the request.

11.1.3.2. Marketers shall ensure that all internal DNC requests are honored, regardless of whether outbound telemarketing calls are placed by the Marketer or a Third Party Telemarketing Vendor.

11.2. <u>Disclosures</u>. When telemarketing, Marketers shall immediately disclose the following information:

> ➤ The identity of the seller providing the goods or services for sale;

> ➤ That the purpose of the call is to sell goods or services; and

> ➤ The nature of the goods or services being offered.

11.3. <u>Caller ID</u>. Marketers shall always display an accurate caller ID number when calling consumers. Marketers shall not "spoof" their caller ID with a number or name that does not belong to them.

11.4. <u>Calling Time and/or Day Restrictions</u>. Marketers that make outbound telemarketing calls shall comply with all federal and state restrictions limiting the times and/or days on which such calls may be made.

11.4.1. *Calling Time Restrictions.* Marketers shall not make outbound telemarketing calls to consumers before 8:00 AM or after 9:00 PM local time at the called party's location or in violation of state laws or regulations that impose more restrictive calling time limitations.

11.4.2. *Calling Day Restrictions.* Marketers shall comply with all state laws and/or regulations that prohibit outbound telemarketing calls on Sundays, official state holidays and/or during a state of emergency.

11.5. <u>Automatic Telephone Dialing Systems</u>. Marketers using an automatic telephone dialing system ("ATDS") to place outbound calls shall do so in accordance with all applicable federal and state laws and regulations.

11.5.1. *Cellular Telephones.* Marketers shall not use an ATDS to place calls to cellular telephones or any other number for which the called party is charged without obtaining the consumer's prior written express consent to be contacted at that number.

11.5.1.1. Marketers shall scrub their calling lists against a wireless number list unless the calling list only includes wireless numbers where the consumer has given their express consent to receive sales calls

11.5.2. *Other Prohibited Numbers.* Marketers shall not use an ATDS to place outbound calls to any emergency telephone number or to a telephone number assigned to any guest or patient room at a hospital or healthcare facility.

11.5.3. *Calls to Multi-line Businesses.* An ATDS shall not be used in such a way as to engage two or more telephone lines of a multi-line business simultaneously.

11.5.4. *Abandoned Calls.* Marketers shall comply with federal and state laws and regulations that prohibit outbound calls from being abandoned.

11.5.4.1. For purposes of these Standards, a call is abandoned if a person answers it and the telemarketer does not connect the call to a sales representative with two (2) seconds of the person's completed greeting.

11.5.4.2. Marketers shall not abandon more than three percent (3%) of outbound telephone calls answered by a person, measured over each successive thirty (30) day period.

11.5.4.3. If a sale representative is not available to speak with the person answering the call within two (2) seconds, that person must receive a prerecorded identification message that states **only** the name and telephone number of the business, entity or individual on whose behalf the call was placed and that the call was for "telemarketing purposes." The telephone number provided must permit any individual to make a DNC request during regular business hours for the duration of the telemarketing campaign.

11.5.4.4.  Unanswered telemarketing calls may not be disconnected prior to at least fifteen (15) seconds or four (4) rings.

11.5.5. Marketers shall not dial a telephone number for the purpose of determining whether the line is a facsimile or voice line or has an answering machine

11.5.6. *Affidavits*.  Marketers using an ATDS shall sign an affidavit stating that the VPA's Outbound Telemarketing Standards will be followed.

11.6.  <u>Prerecorded Messages</u>.  Marketers shall not use prerecorded sales messages at any point during the sales process.

11.6.1. Pursuant to Standard 5.5.4.3, Marketers are permitted and shall leave an informational prerecorded message when outbound telemarketing calls are abandoned.  The content of this message shall be limited to the information listed in Standard 5.5.4.3.

11.7.  <u>Association DNC List</u>.  If the VPA establishes an Association-wide DNC list, all Marketers shall scrub their outbound call lists against this list according to the procedures established by the VPA Board.  Marketers who receive DNC requests shall provide those numbers to the VPA for inclusion in the Association-wide DNC list according to the procedures established by the Board

11.8.  <u>Third Party Telemarketing Vendors</u>.  If a Marketer uses a Third Party Telemarketing Vendor, even if the Vendor is not located in the United States, the Marketer shall require the Vendor to follow these Standards and all applicable laws and regulations of the Federal Trade Commission, the Federal Communications Commission, the Federal Reserve Board, the United States Postal Service and all other applicable federal, state, and local regulations and laws.

11.8.1. *Do Not Call Laws*.  Marketers shall ensure Third Party Telemarketing Vendors comply with all federal and state DNC laws and regulations, including the requirements to scrub all non-exempt calls against applicable DNC lists and against the Marketer's internal DNC list.

11.8.2. *Transfer Calls*.  Before a Marketer accepts a transfer call from anyone, the Marketer must conduct reasonable due diligence to ensure that the transfers were obtained legally.  A Marketer shall not accept a transfer-call if it is known, or reasonably could have been determined, that the transferred call originated with an illegal prerecorded message

11.8.3. *Certification of Third Party Telemarketing Vendors*.  Marketers shall not use Third Party Telemarketing Vendors to make outbound telephone calls on its behalf unless the Vendor is certified by the VPA or an independent third-party organization approved by the VPA, such as the Professional Association for Customer Engagement.  The application for such certification must be done immediately and an aggressive timeframe for certification must be set and scheduled.

11.8.4. *Affidavits.* Marketers using Third Party Telemarketing Vendors shall sign an affidavit stating that the VPA's Outbound Telemarketing Standards will be followed.

11.9.  Negative Option Requirements.  Many other telemarketing laws apply if a Marketer's offer contains a negative option or a free to pay conversion.  If a Marketer is using these offers, the Marketer shall ensure that it is complying with all applicable laws.

## Section 3: Standards for Administrators

## 12. *Basic Standards*

12.1.  Contracts.  Administrator or their 3rd party fulfillment provider shall provide the purchaser with a copy of the contract electronically or mail the contract to the consumer within three (3) business days of when the consumer agrees to purchase the contract.

12.1.1. *Fulfillment and Evidence of Shipment.* Fulfillment Companies shall work in partnership with each Administrator to establish specific times for when and how fulfillment packages, including service contracts, are sent to consumers. Fulfillment Companies shall maintain evidence that they sent the consumer their contract and when it was sent.

12.1.2. *General Requirements.* The contract shall be dated, clearly written in understandable language and printed or typed in easy to read type.

12.1.3. *Contract Provisions.* Vehicle Service Contracts shall contain the following information and any additional information required by applicable state and/or federal laws and regulations:

> ➢ The purchase price;
> ➢ The terms of the contract and coverage dates;
> ➢ A description of the merchandise covered and the services to be provided, including any limitations, exceptions or exclusions from coverage;
> ➢ The terms, restrictions and/or conditions governing cancellations;
> ➢ Deductible amount;
> ➢ The conditions and procedures for filing a claim, including the telephone number to be called and whether claims must be preauthorized;
> ➢ All of the obligations and duties of the contract holder;
> ➢ Any applicable renewal provisions of the contract;
> ➢ Any restrictions on transferability; and
> ➢ Any state mandated disclosures.

12.1.4. *Filing Contracts with States.* Where required, Administrators shall have their contracts approved by or filed with the appropriate state.

12.2. <u>Customer Service</u>. Administrators shall employ an adequate staff to promptly respond to customer service inquiries and telephone calls.

12.3. <u>Duplicative Coverage</u>. Administrators shall not knowingly sell a consumer duplicative coverage of a warranty or service contract that the consumer already possesses.

12.4. <u>Payment Plans</u>. Once a payment plan has been submitted to a Payment Processor and the information related to the Vehicle Service Contract and payment plan has been sent to the Service Contract Holder by the Fulfillment Company or the Marketer, Administrators shall not rewrite or submit the payment plan to a different Payment Processor without the express written consent of the original Provider and/or Administrator and the original Payment Processor.

12.5. <u>Funding Disputes</u>. Providers, Administrators, Payment Processors and/or Marketers shall resolve all disputes related to the funding of a service contract and/or refund without bringing the contract holder into the dispute.

12.6. <u>Compliance Officer</u>. Administrators shall appoint a representative of the company to serve at its compliance officer. The compliance officer's duties shall include ensuring that the Administrator is complying with all state and federal laws and regulations, as well as the guidelines set forth in the Standards of Conduct.

12.7. <u>Criminal Background Checks</u>. Administrators shall conduct criminal background checks on newly hired employees involved with claims and financial processes and officers and senior managers

12.8. <u>Audits</u>. Administrators shall provide the Association and/or its auditor(s) with reasonable access to its facilities, policies and procedures for purposes of assessing the Administrator's compliance with these Standards in connection with certification, certification renewal and/or Association investigations.

12.9.1 Administrators may, at their own expense, have an independent third party firm audit each Marketer with which they conduct business to ensure that they are complying with these Standards and their contractual terms.

12.9.2 Administrators may also choose to conduct audits themselves of Marketers with which they conduct business to ensure that they are complying with these Standards and their contractual terms.

12.9.3 In the event the Marketer refuses to timely and reasonably provide access for the audit, the Administrator shall inform the Association. The Association may refer the matter to the Administrator's Council and/or the Board of Directors for a determination if further action is warranted.

12.9. <u>Financial Audits</u>. Administrators and Finance Companies shall possess audited financial statements on an annual basis. This Standard does not compel the entity to share the statements with the VPA or any other entity.

# 13. *Business Relationships with Marketers*

13.1. <u>Due Diligence</u>. Pursuant to Standard 2.1.1, Administrators shall conduct due diligence on all companies with which they conduct business. Best practices for conducting due diligence on Marketers include, but are not limited to, the following:

13.1.1. *Detailed Application*. Requiring Marketers to complete a detailed application and provide relevant information regarding the Marketer and its principals, including articles of incorporation or organization and proof of applicable state registrations;

13.1.2. *Background Checks*. Completing background checks and credit reports on the principals of the Marketer (owners and executive officers) to ensure that any adverse information is appropriately considered in the approval process;

13.1.3. *Financial Statements*. Review and consideration of the Marketer's financial statements;

13.1.4. *Initial Review of Business Practices*. Conducting an initial review of the Marketer's proposed business practices and marketing methods;

13.1.5. *Ongoing Review of Business Practices*. Conducting periodic ongoing reviews of the Marketer's business practices and marketing methods, including, but not limited to, use of the VPA Certification Program to conduct an annual audit of the Marketer; and

13.1.6. *Training*. Providing ongoing compliance and product training to Marketers and/or requiring Marketers to participate in ongoing compliance training provided by the VPA.

13.2. <u>Compliance Attestation</u>. Administrators shall require the Marketers with which they conduct business to attest, in writing, that they will adhere to the VPA Standards of Conduct, regardless of whether the Marketer is a current VPA Member.

13.3. <u>Required Participation in the VPA Call Monitoring Program</u>. Administrators shall require the Marketers with which they conduct business to participate in the VPA's Call Monitoring Program, regardless of whether the Marketer is a current VPA Member.

13.4. <u>State Authorization Forms</u>. Providers and/or Administrators shall provide each Marketer with which it conducts business a form that lists the states in which the Marketer can sell and the Provider's name, Insurer's name and insurance arrangement by state.

### 14. *Claims Handling*

14.1.  <u>In General</u>.  Providers and/or Administrators shall uphold the contractual provisions of the service contracts they issue and/or administer and shall process claims in a prompt manner.  Providers and Administrators may establish their own policies and procedures regarding how claims will be handled so long as such policies and procedures comport with the terms of the service contract, these Standards and applicable state and federal law.

14.2.  <u>Denial of Claim Based Solely on Non-Payment</u>.  Providers and/or Administrators shall not deny a claim solely because the contract holder is late making a payment unless the contract has been cancelled for non-payment in accordance with the provisions of the contract and applicable laws.  The Provider and/or Administrator may request payment to be made prior to processing the claim. This Standard does not apply to month-to month contracts.

14.3.  <u>Sharing of Claims Information</u>. Providers and/or Administrators shall provide the Marketer that sold the service contract with timely access to claims information in order to facilitate better customer service for service contract holders.

### 15. *Refund Policies and Procedures*

15.1.  <u>Minimum Full Refund Period</u>.  Administrators shall honor all consumer refund requests made within thirty (30) days of the date they sold the contract in full or longer if the contract so states.

15.1.1.  *Other Refunds*.  If the consumer has also made subsequent payments, the Administrator shall provide or ensure that the Marketer makes the refund within thirty (30) days from the date they receive the completed notice of cancellation with odometer information or pursuant to a applicable state requirements. Regardless of the refund process, the Administrator is responsible for the refunds made to consumers.

15.2.  <u>Written Refund Policies and Procedures</u>.  All Providers and Administrators shall have written policies and procedures in place to ensure that consumer refunds are made in a timely manner and in accordance with applicable laws.

15.2.1.  *Applicability to Marketers*.  Refund policies and procedures implemented by Providers and/or Administrators shall incorporate the obligations of the Marketers that solicit on their behalf. Administrators are responsible for refunding both its own and out-of-business marketers' share of the refund.

15.2.2.  *Tracking Refunds*.  Refund policies and procedures implemented by Providers and/or Administrators shall include a method for tracking and documenting refunds.

15.3.  <u>State Cancellation Laws</u>.  Administrators must be aware of and comply with all applicable state laws governing refunds and/or applicable three (3) day right to cancel laws. Refunds must be processed in the manner most advantageous to the customer based on the contract provisions or the state cancellation laws in effect on the contract issuance date.

15.4.  <u>Written Cancellation Fee Calculation</u>. Upon request, Administrators shall provide a written cancellation fee calculation and state the information upon which they based the calculation.

15.5.  <u>Cash Reserves</u>. Administrators shall maintain adequate cash reserves to timely issue the entirety of the refund to all consumers that are entitled to a refund pursuant to the Administrator's cancellation policy and applicable state and federal laws.

# APPENDIX A:

## VSC VOICE CONFIRMATION DISCLOSURE

Congratulations on the purchase of your *Admin, Inc.* protection plan for your vehicle from *XYZ Seller*! You have selected *X Plan Brand* for_____months or_____miles, whichever occurs first. During this period you will be provided *Y Coverage Type plan* on your vehicle. Your protection plan has a waiting period, so coverage will commence at the sooner of the passing of_____days and_____miles from your current odometer statement. (This should be consistent with the Vehicle Service Contract sold).

You will receive a full contract containing all terms and conditions in the mail shortly. Please contact us at *(800) 123-4567* if you do not receive your package. Upon receipt of your contract, please be sure to review the coverage, terms, conditions and exclusions to confirm it meets your needs. You have_____days from today, *(June 1st)*, to review your coverage and are entitled to a full refund during this period. (This should be consistent with the Vehicle Service Contract sold). After 30 days, you are entitled to a pro-rata refund, subject to claims paid and any cancellation fees outlined in the contract.

The contact information we have on file is *Mr. John Q. Customer* located at *123 Main Street, City, State 12345.* Your email address is *John.Smith@email.com.* You have elected a down payment of *$200* and *12* installment payments of *$150.00* which will be processed by our partner *Payment Processor, Inc.*

Your monthly payment will be charged to your *Visa* credit card account number ending in *1234* on or around the *5th day of each month* starting *July 5, 2009.* At this time, we will need your voice verification of these terms and conditions and to authorize the charges to your account. Do you authorize a charge today of $200? Do you authorize 12 monthly charges of $150 beginning on July 5 and each month thereafter until your balance is paid in full? (Need to receive a verbal YES).

X Plan Brand = Administrator's Brand Name

Y Coverage Type Options: Exclusionary, Named Component, Power train

**<u>Exhibit D</u>**



**ROYAL**
ADMINISTRATION
SERVICES, INC.

51 Mill Street, Building F, Hanover, MA 02339
P 800.871.0467 • F 781.261.2522

September 20, 2017

***Via Email and UPS Overnight Delivery***

Private Reserve Group Inc. d/b/a Auto Protection Services
3242 Halladay Street
Santa Ana, CA 92705
Attn: Pejman Ghaneian

***Re: Agreement dated February 23, 2015 (the "Agreement")***

Dear Pejman Ghaneian:

Please be advised that pursuant to Section 6.3.III of the above-referenced Agreement, this letter
will serve as notice that the Agreement has been terminated effective immediately.

Please be reminded that with regard to service agreements sold prior to this date, the obligations
of all parties remain in full force and effect, termination of the Agreement notwithstanding.

Thank you in advance for your anticipated cooperation.

Very truly yours,

Meaghan Pomeroy
General Counsel

cc:  Inline Data Systems, via email
     Paylink Direct, via email
     Jim Donovan, via email